**WHATLEY DRAKE, LLC**
JOE R. WHATLEY, JR.
PETER H. BURKE
2323 Second Avenue North
Birmingham, AL 35202
Telephone: 205/328-9576
Facsimile: 205/328-9669

Plaintiffs' Lead Co-Counsel

**REICH & BINSTOCK, LLP**
PAUL T. WARNER
4265 San Felipe, Suite 1000
Houston, TX 77027
Telephone: 713/622-7271
Facsimile: 713/623-8724

Plaintiffs' Lead Co-Counsel

**GILBERT & SACKMAN**, A LAW CORPORATION
JAY SMITH (SBN 166105)
LAURIE A. TRAKTMAN (SBN 165588)
6100 Wilshire Blvd., Suite 700
Los Angeles, CA 90048
Telephone: 323/938-3000
Facsimile: 323/937-9139

Plaintiffs' Liaison Counsel

COPY

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| In re ARIBA, INC. DERIVATIVE LITIGATION<br><br>_____<br><br>This Document Relates To:<br><br>ALL ACTIONS<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CV-03-02172 JF<br>(Derivative Action)<br><br>Assigned to Hon. Jeremy Fogel<br><br>CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR VIOLATION OF THE SARBANES-OXLEY ACT, BREACH OF FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS MANAGEMENT, WASTE OF CORPORATE ASSETS, UNJUST ENRICHMENT AND VIOLATIONS OF CALIFORNIA CORPORATIONS CODE<br><br>DEMAND FOR JURY TRIAL |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiffs, by their attorneys, submit this Verified Derivative Complaint (the "Complaint") against the defendants named herein.

## NATURE OF THE ACTION

1.       This is a shareholder derivative action brought by a shareholder of Ariba, Inc. ("Ariba" or the "Company"), on behalf of the Company against certain of its officers and directors seeking to remedy defendants' violations of California law, and violations of the Sarbanes-Oxley Act, breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets, unjust enrichment and violations of California Corporations Code which occurred between October 1999 and the present (the "Relevant Period") and which have caused substantial losses to Ariba and other damages, such as to its reputation and goodwill.

## JURISDICTION AND VENUE

2.       This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 in that plaintiff's claims arise in part out of the laws of the United States, including the Sarbanes-Oxley Act of 2002, and pursuant to 28 U.S.C. §1332(a)(1) in that plaintiff and defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interest and costs.  Nominal defendant Ariba is a Delaware corporation and has its principal place of business in California.

3.       Venue is proper in this District pursuant to 28 U.S.C. §1391(a), in that many of the acts and the conduct constituting the violations of law complained of herein occurred in this District, and because nominal defendant Ariba maintains its principal executive offices in this District.

## INTRADISTRICT ASSIGNMENT

4.       This action is properly assigned to the San Jose Division of this District pursuant to Civil L.R. 3-5(b) because nominal defendant Ariba is located in Santa Clara County.

## SUMMARY OF THE ACTION

5.       Ariba is a spend-management software solutions provider. Ariba provides software, services and network access to enable corporations to evaluate and manage the cash costs associated with running their business. The Ariba Enterprise Spend Management solution is an integrated suite of applications and services that provides customers with a single solution to analyze and manage

their spending on items such as commodities, raw materials, operating resources, services, temporary labor, travel, and maintenance, repair and operations equipment.

6.     This action results from defendants' causing and allowing Ariba to announce that it will have to restate its financial statements for the fiscal years ended September 30, 2001 and 2000 and for the quarters ending December 31, 1999 through June 30, 2002 because of improper accounting transactions. Additionally, while in possession of information concerning these transactions, the defendants sold over $1.2 billion worth of Ariba shares during the Relevant Period.

7.     On January 15, 2003, defendants caused the Company to issue a press release entitled, "Ariba Provides Update on Accounting Review and Restatement of Financial Statements." The press release stated in part:

> Ariba, Inc. announced today that it will restate its financial statements for the fiscal years ended September 30, 2001 and 2000 and for the quarters ended March 31, 2000 through June 30, 2002 as a result of an ongoing review of accounting matters. The company also announced that because this review is not yet completed, it has not yet filed its annual report on Form 10-K for the fiscal year ended September 30, 2002 with the Securities and Exchange Commission.

8.     On April 10, 2003, after completing its accounting review the defendants caused the Company to announce that as a result of its review it has restated its financial statements for the fiscal years ended September 30, 2000 and 2001, and for the quarters ended December 31, 1999 through June 30, 2002.

## THE PARTIES

9.     Plaintiff Keith Bernhardt ("Bernhardt") is, and at times relevant hereto was, an owner and holder of Ariba common stock. Bernhardt is a citizen of Wyoming.

10.     Plaintiff Leonard Cypcar ("Cypcar") is, and at times relevant hereto was, an owner and holder of Ariba common stock. Cypcar is a citizen of Wisconsin.

11.     Nominal defendant Ariba is a corporation organized and existing under the laws of the State of Delaware with its headquarters located at 807 11th Avenue, Sunnyvale, California, 94089.

12.     Defendant Keith J. Krach ("Krach") is, and at all times relevant hereto was, Chairman of the Board of Directors and the former President and Chief Executive Officer ("CEO") of Ariba. Krach is a citizen of California. Because of Krach's position, he knew the adverse non-public

information about the business of Ariba, as well as its improper accounting transactions, finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Krach participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. During the Relevant Period, Krach sold over 4.5 million shares of Ariba stock for proceeds of over $193.7 million. For FY:01, FY:00 and FY:99, Ariba paid Krach $280,716, $252,808 and $166,983 respectively in salary, bonus and other compensation and in 1999 granted him 1,600,000 options to purchase Ariba stock.

13.    Defendant Robert M. Calderoni ("Calderoni") is President, CEO and a director of Ariba, and has been since October 17, 2001. On information and belief Calderoni is a citizen of California. Because of Calderoni's positions, he knew the adverse non-public information about the business of Ariba, as well as its improper accounting transactions, finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors' meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Calderoni participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. For FY:01, Ariba paid Calderoni $2,536,705 in salary, bonus and other compensation and granted him 2,500,000 options to purchase Ariba stock.

14.    Defendant Robert E. Knowling, Jr. ("Knowling") is a director of Ariba and has been since July 2000. Knowling is a citizen of Colorado. Because of Knowling's position, he knew the adverse non-public information about the business of Ariba, as well as its improper accounting transactions, finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board of Directors' meetings and committees thereof and via reports and other

information provided to him in connection therewith.  During the Relevant Period, Knowling participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.

15.    Defendant Robert C. Kagle ("Kagle") is, and at all times relevant hereto was, a director of Ariba.  Kagle is a citizen of California.  Because of Kagle's position, he knew the adverse non-public information about the business of Ariba, as well as its improper accounting transactions, finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board of Directors' meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Kagle participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  During the Relevant Period, Kagle sold 266,000 shares of Ariba stock for proceeds of over $32 million.

16.    Defendant Paul Hegarty ("Hegarty") was a director of Ariba up until October 30, 2002. Hegarty is a citizen of California.  Because of Hegarty's position, he knew the adverse non-public information about the business of Ariba, as well as its improper accounting transactions, finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board of Directors' meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Hegarty participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  During the Relevant Period, Hegarty sold over 2.5 million shares of Ariba stock for proceeds of over $126.9 million.

17.    Defendant John B. Mumford ("Mumford") was a director of Ariba up until April 30, 2001.  Mumford is a citizen of California.  Because of Mumford's position, he knew the adverse non-public information about the business of Ariba, as well as its improper accounting transactions, finances, markets and present and future business prospects, via access to internal corporate

1   documents, conversations and connections with other corporate officers and employees, attendance

2   at Board of Directors' meetings and committees thereof and via reports and other information provided

3   to him in connection therewith. During the Relevant Period, Mumford participated in the issuance

4   of false and/or misleading statements, including the preparation of the false and/or misleading press

5   releases and SEC filings. During the Relevant Period, Mumford sold 333,076 shares of Ariba stock

6   for proceeds of over $16.9 million.

7       18.    Defendant Hatim A. Tyabji ("Tyabji") was a director of Ariba up until October 17,

8   2001. Tyabji is a citizen of California. Because of Tyabji's position, he knew the adverse non-public

9   information about the business of Ariba, as well as its improper accounting transactions, finances,

10  markets and present and future business prospects, via access to internal corporate documents,

11  conversations and connections with other corporate officers and employees, attendance at Board of

12  Directors' meetings and committees thereof and via reports and other information provided to him in

13  connection therewith. During the Relevant Period, Tyabji participated in the issuance of false and/or

14  misleading statements, including the preparation of the false and/or misleading press releases and SEC

15  filings. During the Relevant Period, Tyabji sold 243,000 shares of Ariba stock for proceeds of over

16  $12.7 million.

17      19.    Defendant Lawrence A. Mueller ("Mueller") was the former CEO, President, Chief

18  Operating Officer of Ariba and was a director from April 30, 2001 until July 19, 2001. Mueller is a

19  citizen of Colorado. Because of Mueller's position, he knew the adverse non-public information about

20  the business of Ariba, as well as its improper accounting transactions, finances, markets and present

21  and future business prospects, via access to internal corporate documents, conversations and

22  connections with other corporate officers and employees, attendance at Board of Directors' meetings

23  and committees thereof and via reports and other information provided to him in connection

24  therewith. During the Relevant Period, Mueller participated in the issuance of false and/or misleading

25  statements, including the preparation of the false and/or misleading press releases and SEC filings.

26  During the Relevant Period, Mueller sold 150,000 shares of Ariba stock for proceeds of over $19.7

27  million. For FY:01 and FY:00, Ariba paid Mueller $8,108,645 and $385,138 respectively in salary,

28

1   45.   After further investigation, the Company has further determined that chartered air

2   services provided personally by Krach to Mueller should be treated similarly as a capital contribution

3   from Krach to Ariba and a payment of compensation from the Company to Mueller. These services

4   were provided over the period from September 2000 through July 2001 at a total cost of $1.2 million.

5   46.   In addition, Ariba has concluded that certain stock options issued to a limited number

6   of individuals by companies that Ariba acquired during fiscal 2000 should be accounted for as stock-

7   based compensation expense to Ariba, rather than amortized as goodwill. As a result, an increase in

8   non-cash stock-based compensation expense and a reduction of goodwill amortization expense will

9   be reflected in Ariba's restated financial statements for fiscal 2000, 2001 and 2002.

10   47.   As a result of these improper accounting transactions, the Individual Defendants have

11   caused the Company to restate their financials for 2000, 2001 and 2002.

12   **IMPROPER STATEMENTS**

13   48.   On January 11, 2000, the Individual Defendants caused the Company to issue a press

14   release entitled, "Ariba Announces Record First Quarter Revenues of $23.5 Million, Up 243%; Net

15   Loss Per Share $0.07, Beats First Call Estimates." The press release stated in part:

16   > Ariba, Inc., the leader in business-to-business electronic commerce, today announced
   > record results for the first quarter ended December 31, 1999.

17
18   > Revenues for the first quarter of fiscal 2000 marked the largest quarter in
   > Ariba's history at $23.5 million, up 243 percent from the same period last year. Net
   > loss for the quarter excluding the amortization of stock-based compensation was $5.6
19   > million or a loss of $0.07 per share, beating the First Call consensus estimate of a loss
   > of $0.11 per share. During the corresponding quarter in fiscal 1999, the net loss was
20   > $1.2 million or a loss of $0.07 per share, excluding the amortization of stock-based
   > compensation. Including the amortization of stock-based compensation, net loss for
21   > the first quarter of fiscal 2000 was $10.3 million or a loss of $0.13 per share.

22   49.   On April 12, 2000, the Individual Defendants caused the Company to issue a press

23   release entitled, "Ariba Announces Record Second Quarter Revenues of $40 Million, Up 322%; Net

24   Loss Per Share $0.06, Beats First Call Estimates." The press release stated in part:

25   > Ariba, Inc., the leading business-to-business (B2B) eCommerce platform provider,
   > today announced record results for the second quarter ended March 21, 2000.

26
27   > Revenues for the second quarter of fiscal 2000 marked the largest quarter in
   > Ariba's history at $40.0 million, up 322 percent from the same period last year. Net
   > loss for the quarter excluding non-operating charges was $11.5 million or a loss of

28

---

this time the Individual Defendants caused the Company to conceal the true fact that Ariba was misrepresenting its financial results.  In addition, defendants also made other specific, false statements about Ariba's accounting transactions and financial performance, as alleged herein.

41.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment; to conceal adverse information concerning the Company's operations, financial condition, and future business prospects; and to artificially inflate the price of Ariba common stock so they could: (i) dispose of over $1.2 billion of their personally held stock; and (ii) protect and enhance their executive and directorial positions and the substantial compensation and prestige they obtained as a result thereof.

42.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly or negligently misrepresent its financial results.  Because the actions described herein occurred under the authority of the Board of Directors, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

43.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

**BACKGROUND**

44.     During the Relevant Period, defendants should have treated a $10 million payment provided personally by Krach in March 2001 to Mueller as a $10 million capital contribution from Krach to Ariba and the payment of compensation from Ariba to Mueller, not as a personal transaction.

1    to outside counsel; and

2          b.      Costs incurred in investigating and defending Ariba and certain officers in the

3    class actions, plus potentially millions of dollars in settlements or to satisfy an adverse judgment.

4       37.      Moreover, these actions have irreparably damaged Ariba's corporate image and

5    goodwill. For at least the foreseeable future, Ariba will suffer from what is known as the "liar's

6    discount," a term applied to the stocks of companies who have been implicated in illegal behavior and

7    have misled the investing public, such that Ariba's ability to raise equity capital or debt on favorable

8    terms in the future is now impaired.

9         **CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

10       38.      In committing the wrongful acts alleged herein, the Individual Defendants have

11    pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and

12    conspired with one another in furtherance of their common plan or design. In addition to the wrongful

13    conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and

14    abetted and/or assisted each other in breach of their respective duties.

15       39.      During all times relevant hereto, the Individual Defendants collectively and

16    individually initiated a course of conduct which was designed to and did: (i) conceal the fact that the

17    Company was improperly misrepresenting its financial results, in order to allow defendants to

18    artificially inflate the price of the Company's shares; (ii) maintain the Individual Defendants'

19    executive and directorial positions at Ariba, and the profits, power and prestige which the Individual

20    Defendants enjoyed as a result of these positions; and (iii) deceive the investing public, including

21    shareholders of Ariba, regarding the Individual Defendants' management of Ariba's operations, the

22    Company's financial health and stability, and future business prospects, specifically related to the

23    Company's financials which had been misrepresented by defendants throughout the Relevant Period.

24    In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively

25    and individually took the actions set forth herein.

26       40.      The Individual Defendants engaged in a conspiracy, common enterprise, and/or

27    common course of conduct commencing by at least October 1999 and continuing thereafter. During

28

1  Company's financial results and prospects, and ensuring that the Company maintained an adequate

2  system of financial controls such that the Company's financial reporting would be true and accurate

3  at all times;

4          e.     remain informed as to how Ariba conducted its operations, and, upon receipt

5  of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry

6  in connection therewith, and to take steps to correct such conditions or practices and make such

7  disclosures as necessary to comply with federal and state securities laws; and

8          f.     ensure that the Company was operated in a diligent, honest, and prudent manner

9  in compliance with all applicable federal, state, and local laws, rules, and regulations.

10      35.    Each Individual Defendant, by virtue of his or her position as a director and/or officer,

11  owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the

12  exercise of due care and diligence in the management and administration of the affairs of the

13  Company, as well as in the use and preservation of its property and assets.  The conduct of the

14  Individual Defendants complained of herein involves a knowing and culpable violation of their

15  obligations as directors and officers of Ariba, the absence of good faith on their part, and a reckless

16  disregard for their duties to the Company and its shareholders which the Individual Defendants were

17  aware or should have been aware posed a risk of serious injury to the Company.  The conduct of the

18  Individual Defendants who were also officers and/or directors of the Company during the Relevant

19  Period has been ratified by the remaining Individual Defendants who collectively comprised all of

20  Ariba's Board during the Relevant Period.

21      36.    The Individual Defendants breached their duties of loyalty and good faith by causing

22  the Company to misrepresent its financial results and prospects, as detailed herein *infra*, and by failing

23  to prevent such illegal actions.  In addition, as a result of defendants' illegal actions and course of

24  conduct during the Relevant Period, the Company is now the subject of several class action law suits

25  which allege violations of federal securities laws.  As a result, Ariba has expended and will continue

26  to expend significant sums of money.  Such expenditures include, but are not limited to:

27          a.     Costs incurred to carry out internal investigations, including legal fees paid

28

1  In addition, as officers and/or directors of a publicly held company, the Individual Defendants had

2  a duty to promptly disseminate accurate and truthful information with regard to the Company's

3  accounting transactions so that the market price of the Company's stock would be based on truthful

4  and accurate information.

5        32.    The Individual Defendants, because of their positions of control and authority as

6  directors and/or officers of Ariba, were able to and did, directly and/or indirectly, exercise control

7  over the wrongful acts complained of herein, as well as the contents of the various public statements

8  issued by the Company.  Because of their advisory, executive, managerial, and directorial positions

9  with Ariba, each of the Individual Defendants had access to adverse non-public information about the

10  financial condition, operations, and improper representations of Ariba.

11        33.    At all times relevant hereto, each of the Individual Defendants was the agent of each

12  of the other Individual Defendants and of Ariba, and was at all times acting within the course and

13  scope of such agency.

14        34.    To discharge their duties, the officers and directors of Ariba were required to exercise

15  reasonable and prudent supervision over the management, policies, practices and controls of the

16  financial affairs of the Company.  By virtue of such duties, the officers and directors of Ariba were

17  required to, among other things:

18        a.    refrain from acting upon material inside corporate information to benefit

19  themselves;

20        b.    ensure that the Company complied with its legal obligations and requirements,

21  including acting only within the scope of its legal authority and disseminating truthful and accurate

22  statements to the SEC and the investing public;

23        c.    conduct the affairs of the Company in an efficient, business-like manner so as

24  to make it possible to provide the highest quality performance of its business, to avoid wasting the

25  Company's assets, and to maximize the value of the Company's stock;

26        d.    properly and accurately guide investors and analysts as to the true financial

27  condition of the Company at any given time, including making accurate statements about the

28

1  filings.  During the Relevant Period, Touw sold 1 million shares of Ariba stock for proceeds of over

2  $58.7 million.

3      28.    Defendant David L. Rome ("Rome") Vice President of Ariba.  Rome is a citizen of

4  California.  Because of Rome's position, he knew the adverse non-public information about the

5  business of Ariba, as well as its improper accounting transactions, finances, markets and present and

6  future business prospects, via access to internal corporate documents, conversations and connections

7  with other corporate officers and employees, attendance at management meetings and via reports and

8  other information provided to him in connection therewith.  During the Relevant Period, Rome

9  participated in the issuance of false and/or misleading statements, including the preparation of the

10  false and/or misleading press releases and SEC filings.  During the Relevant Period, Rome sold over

11  1.5 million shares of Ariba stock for proceeds of over $106.5 million.

12      29.    The defendants identified in ¶¶12-28 are referred to herein as the "Director

13  Defendants."  The defendants identified in ¶¶12-13, 21-28 are referred to herein as the "Officer

14  Defendants." The defendants identified in ¶¶12-13, 15-16, 18-28 are referred to herein as the "Insider

15  Selling Defendants."  Collectively, the Director Defendants, the Officer Defendants and the Insider

16  Selling Defendants are referred to herein as the "Individual Defendants."

17                    **DUTIES OF THE INDIVIDUAL DEFENDANTS**

18      30.    By reason of their positions as officers, directors, and/or fiduciaries of Ariba and

19  because of their ability to control the business and corporate affairs of Ariba, the Individual

20  Defendants owed Ariba and its shareholders fiduciary obligations of trust, loyalty, good faith and due

21  care, and were and are required to use their utmost ability to control and manage Ariba in a fair, just,

22  honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance

23  of the best interests of Ariba and its shareholders so as to benefit all shareholders equally and not in

24  furtherance of their personal interest or benefit.

25      31.    Each director and officer of the Company owes to Ariba and its shareholders the

26  fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company

27  and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

28

---

1   knew the adverse non-public information about the business of Ariba, as well as its improper

2   accounting transactions, finances, markets and present and future business prospects, via access to

3   internal corporate documents, conversations and connections with other corporate officers and

4   employees, attendance at management meetings and via reports and other information provided to him

5   in connection therewith. During the Relevant Period, Lent participated in the issuance of false and/or

6   misleading statements, including the preparation of the false and/or misleading press releases and SEC

7   filings. During the Relevant Period, Lent sold over 1.4 million shares of Ariba stock for proceeds of

8   over $107.5 million.

9        26.    Defendant Paul L. Melchiorre ("Melchiorre") was, at times relevant hereto, Vice

10   President of North America Operations for Ariba. Melchiorre is a citizen of New Jersey. Because

11   of Melchiorre's position, he knew the adverse non-public information about the business of Ariba, as

12   well as its improper accounting transactions, finances, markets and present and future business

13   prospects, via access to internal corporate documents, conversations and connections with other

14   corporate officers and employees, attendance at management meetings and via reports and other

15   information provided to him in connection therewith.  During the Relevant Period, Melchiorre

16   participated in the issuance of false and/or misleading statements, including the preparation of the

17   false and/or misleading press releases and SEC filings. During the Relevant Period, Melchiorre sold

18   536,994 shares of Ariba stock for proceeds of over $33.5 million.

19        27.    Defendant Paul Touw ("Touw") was, at times relevant hereto, Vice President of

20   Corporate Strategy for Ariba. Touw is a citizen of California. Because of Touw's position, he knew

21   the adverse non-public information about the business of Ariba, as well as its improper accounting

22   transactions, finances, markets and present and future business prospects, via access to internal

23   corporate documents, conversations and connections with other corporate officers and employees,

24   attendance at management meetings and via reports and other information provided to him in

25   connection therewith. During the Relevant Period, Touw participated in the issuance of false and/or

26   misleading statements, including the preparation of the false and/or misleading press releases and SEC

27

28

1  at management meetings and via reports and other information provided to him in connection
2  therewith.   During the Relevant Period, Kleissner participated in the issuance of false and/or
3  misleading statements, including the preparation of the false and/or misleading press releases and SEC
4  filings. During the Relevant Period, Kleissner sold over 1 million shares of Ariba stock for proceeds
5  of over $72.2 million.

6       23.    Defendant Kirk A. Cruikshank ("Cruikshank") was, at times relevant hereto, Executive
7  Vice President of Ariba. Cruikshank is a citizen of California.  Because of Cruikshank's position, he
8  knew the adverse non-public information about the business of Ariba, as well as its improper
9  accounting transactions, finances, markets and present and future business prospects, via access to
10  internal corporate documents, conversations and connections with other corporate officers and
11  employees, attendance at management meetings and via reports and other information provided to him
12  in connection therewith. During the Relevant Period, Cruikshank participated in the issuance of false
13  and/or misleading statements, including the preparation of the false and/or misleading press releases
14  and SEC filings.  During the Relevant Period, Cruikshank sold 526,814 shares of Ariba stock for
15  proceeds of over $46.2 million.

16       24.    Defendant Rune C. Eliasen ("Eliasen") was, at times relevant hereto, Vice President
17  of Ariba.  Eliasen is a citizen of California.  Because of Eliasen's position, he knew the adverse
18  non-public information about the business of Ariba, as well as its improper accounting transactions,
19  finances, markets and present and future business prospects, via access to internal corporate
20  documents, conversations and connections with other corporate officers and employees, attendance
21  at management meetings and via reports and other information provided to him in connection
22  therewith. During the Relevant Period, Eliasen participated in the issuance of false and/or misleading
23  statements, including the preparation of the false and/or misleading press releases and SEC filings.
24  During the Relevant Period, Eliasen sold 556,946 shares of Ariba stock for proceeds of over $51
25  million.

26       25.    Defendant Robert D. Lent ("Lent") was, at times relevant hereto, Vice President of
27  Corporate Developement for Ariba.  Lent is a citizen of California.  Because of Lent's position, he
28

1  bonus and other compensation and granted him 5,000,000 and 1,400,000 options to purchase Ariba

2  stock respectively.

3       20.    Defendant Robert J. DeSantis ("DeSantis") was, at times relevant hereto, Executive

4  Vice President of Ariba. DeSantis is a citizen of California. Because of DeSantis' position, he knew

5  the adverse non-public information about the business of Ariba, as well as its improper accounting

6  transactions, finances, markets and present and future business prospects, via access to internal

7  corporate documents, conversations and connections with other corporate officers and employees,

8  attendance at management meetings and via reports and other information provided to him in

9  connection therewith. During the Relevant Period, DeSantis participated in the issuance of false

10  and/or misleading statements, including the preparation of the false and/or misleading press releases

11  and SEC filings. During the Relevant Period, DeSantis sold over 2.4 million shares of Ariba stock

12  for proceeds of over $221.7 million.

13       21.    Defendant Edward P. Kinsey ("Kinsey") was, at times relevant hereto, Chief Financial

14  Officer ("CFO") and Executive Vice President of Ariba. Kinsey is a citizen of California. Because

15  of Kinsey's positions, he knew the adverse non-public information about the business of Ariba, as well

16  as its improper accounting transactions, finances, markets and present and future business prospects,

17  via access to internal corporate documents, conversations and connections with other corporate

18  officers and employees, attendance at management meetings and via reports and other information

19  provided to him in connection therewith. During the Relevant Period, Kinsey participated in the

20  issuance of false and/or misleading statements, including the preparation of the false and/or

21  misleading press releases and SEC filings. During the Relevant Period, Kinsey sold over 1.3 million

22  shares of Ariba stock for proceeds of over $114.4 million.

23       22.    Defendant Karl C. Kleissner ("Kleissner") was, at times relevant hereto, Vice President

24  of Ariba. Kleissner is a citizen of California. Because of Kleissner's position, he knew the adverse

25  non-public information about the business of Ariba, as well as its improper accounting transactions,

26  finances, markets and present and future business prospects, via access to internal corporate

27  documents, conversations and connections with other corporate officers and employees, attendance

28

1   there would be no directors' and officers' insurance protection and thus, this is a further reason why

2   they will not bring such a suit.  On the other hand, if the suit is brought derivatively, as this action is

3   brought, such insurance coverage exists and will provide a basis for the Company to effectuate

4   recovery.  If there is no directors' and officers' liability insurance at all then the current directors will

5   not cause Ariba to sue them, since they will face a large uninsured liability.

6        72.    Moreover, despite the Individual Defendants having knowledge of the claims and

7   causes of action raised by plaintiff, the current Board of Directors has failed and refused to seek to

8   recover for Ariba for any of the wrongdoing alleged by plaintiff herein.

9        73.    Plaintiff has not made any demand on shareholders of Ariba to institute this action

10  since such demand would be a futile and useless act for the following reasons:

11            a.    Ariba is a publicly held company with approximately 266 million shares

12  outstanding, and thousands of shareholders;

13            b.    Making demand on such a number of shareholders would be impossible for

14  plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

15            c.    Making demand on all shareholders would force plaintiff to incur huge

16  expenses, assuming all shareholders could be individually identified.

17

18                    **COUNT I**

19  **Against Defendants Krach, Calderoni, Mueller and Kinsey**
    **for Disgorgement Under the Sarbanes-Oxley Act**

20       74.    Plaintiffs reallege each prior allegation as though fully set forth herein.

21       75.    Defendants should be required to disgorge the gain they will unjustly obtain at the

22  expenses of Ariba and its shareholders and a constructive trust for the benefit of Ariba and its

23  shareholders should be imposed upon them as contemplated (upon restatement of false and misleading

24  financial statements) by the disgorgement provisions of section 304 of the Sarbanes-Oxley Act of

25  2002, Public Law 107-204 (effective July 30, 2002).

26  ///

27  ///

28

---

1  herein, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by

2  them;

3          j.     Any suit by the current directors of Ariba to remedy these wrongs would

4  likely expose the Individual Defendants and Ariba to further violations of the securities laws which

5  would result in civil actions being filed against one or more of the Individual Defendants, thus, they

6  are hopelessly conflicted in making any supposedly independent determination whether to sue

7  themselves;

8          k.     Ariba has been and will continue to be exposed to significant losses due to

9  the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed

10  any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt

11  to recover for Ariba any part of the damages Ariba suffered and will suffer thereby;

12          l.     If the current directors were to bring this derivative action against themselves,

13  they would thereby expose their own misconduct, which underlies allegations against them contained

14  in class action complaints for violations of securities law, which admissions would impair their

15  defense of the class actions and greatly increase the probability of their personal liability in the class

16  actions, in an amount likely to be in excess of any insurance coverage available to the Individual

17  Defendants. In essence, they would be forced to take positions contrary to the defenses they will

18  likely assert in the securities class actions. This they will not do. Thus, demand is futile; and

19          m.     If Ariba's current and past officers and directors are protected against

20  personal liability for their acts of mismanagement, abuse of control and breach of fiduciary duty

21  alleged in this Complaint by directors' and officers' liability insurance, they caused the Company to

22  purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the

23  stockholders of Ariba. However, due to certain changes in the language of directors' and officers'

24  liability insurance policies in the past few years, the directors' and officers' liability insurance policies

25  covering the defendants in this case contain provisions which eliminate coverage for any action

26  brought directly by Ariba against these defendants, known as, *inter alia*, the "insured versus insured

27  exclusion." As a result, if these directors were to sue themselves or certain of the officers of Ariba,

28

1   in the improper accounting and insider selling, as detailed herein *supra*, the majority of the Board,

2   including the defendants listed below, are subject to the following prejudicial entanglements:

3          i.       Krach and Kagle are long-time business associates:  Defendant Krach

4   was an entrepreneur in residence at Benchmark Partners Capital ("BCP") during 1996.  Defendant

5   Kagle founded BCP in 1995.  Because of their long-standing and entangling business and professional

6   relationships, neither defendant Krach nor defendant Kagle will take the action requested by plaintiff

7   herein against one another or the remainder of the Individual Defendants; and

8          ii.      Calderoni and Wallman are long-time business associates:  Defendant

9   Calderoni is the former CFO and Vice President for IBM.  Defendant Wallman was also a CFO, Vice

10  President and Controller at IBM from 1993-1995.  Because of their long-standing and entangling

11  business and professional relationships, neither defendant Calderoni nor defendant Wallman will take

12  the action requested by plaintiff herein against one another or the remainder of the Individual

13  Defendants;

14         f.       The defendant directors of Ariba, as more fully detailed herein, participated

15  in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts

16  to conceal or disguise those wrongs from Ariba's stockholders or recklessly and/or negligently

17  disregarded the wrongs complained of herein, and therefore are not disinterested parties;

18         g.       In order to bring this suit, all of the directors of Ariba would be forced to sue

19  themselves and persons with whom they have extensive business and personal entanglements, which

20  they will not do, thereby excusing demand;

21         h.       The acts complained of constitute violations of the fiduciary duties owed by

22  Ariba's officers and directors and these acts are incapable of ratification;

23         i.       Each of the defendant directors of Ariba authorized and/or permitted the false

24  statements disseminated directly to the public or made directly to securities analysts and which were

25  made available and distributed to shareholders, authorized and/or permitted the issuance of various

26  of the false and misleading statements and are principal beneficiaries of the wrongdoing alleged

27

28

c.      According to Ariba's Proxy Statement filed with the SEC on or about January 24, 2002, defendants Kagle and Knowling were, during the Relevant Period, members of the Audit Committee.  The Audit Committee reviews, acts on and reports to the Board with respect to various auditing and accounting matters, including the selection of the Company's accountants, the scope of the annual audits, fees to be paid to the Company's accountants, the performance of the Company's accountants and the accounting practices of the Company.  Nonetheless, the Audit Committee recommended that the Board of Directors include the improper audited consolidated financial statements in Ariba's Annual Reports on Form 10-K for the years ended September 30, 2001 and 2000, as filed with the SEC.  By such actions, defendants Kagle and Knowling breached their duties by causing or allowing the improper financials described above.  As a result of these defendants' breach of their duties, any demand upon them is futile;

d.      The entire Ariba Board of Directors and senior management participated in the wrongs complained of herein.  Ariba's directors are not disinterested or independent due to the following: defendants Krach, Calderoni, Kagle, Knowling and Wallman served on the Ariba Board during the Relevant Period.  Pursuant to their specific duties as Board members, each was charged with the management of the Company and to conduct its business affairs.  Each of the above-referenced defendants breached the fiduciary duties that they owed to Ariba and its shareholders in that they failed to prevent and correct the improper financials.  Thus, the Ariba Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because its members are interested personally in the outcome as it is their actions which have subjected Ariba to millions of dollars in liability for possible violations of applicable securities laws;

e.      The Individual Defendants, because of their inter-related business, professional and personal relationships, have developed debilitating conflicts of interest which prevent the Board members of the Company from taking the necessary and proper action on behalf of the Company as requested herein.  In addition to the conflicts that exist as a result of their participation

69.   Plaintiff will adequately and fairly represent the interests of Ariba in enforcing and prosecuting its rights.

70.   Plaintiff is and was an owner of the stock of Ariba during times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the Company.

71.   The current Board of Directors of Ariba consists of the following individuals: defendants Krach, Calderoni, Knowling, Kagle and Wallman.  Plaintiff has not made any demand on the present Board of Directors of Ariba to institute this action because such a demand would be a futile, wasteful and useless act, particularly for the following reasons:

a.   Defendants Krach and Kagle, as a result of their access to and review of internal corporate documents, conversations and connections with other corporate officers, employees, and directors and attendance at management and Board meetings, knew the adverse non-public information regarding the improper accounting.  While in possession of this material adverse non-public information regarding the Company, Krach and Kagle participated in the illegal insider selling:

i.   During the Relevant Period, Krach sold over 4.5 million shares of Ariba stock for proceeds of over $193.7 million; and

ii.   During the Relevant Period, Kagle sold 266,000 shares of Ariba stock for proceeds of over $32.5 million.  Because these defendants personally benefitted from their wrongdoing, any demand upon them is futile;

b.   The principal professional occupation of defendant Calderoni is his employment with Ariba, pursuant to which he received and continues to receive substantial monetary compensations and other benefits.  Specifically, defendant Calderoni received over $2.5 million in salary, bonus and other compensation during the Relevant Period.  Defendant Calderoni lacks independence from defendant Kagle, an interested director due to his insider selling, who controls Calderoni's compensation as one-half of Ariba's Compensation Committee.  Therefore, any demand upon defendant Calderoni is futile;

67.    As a result of the Individual Defendants' actions, Ariba's market capitalization has been damaged by losing over $19 billion from its Relevant Period high.  At the same time that the defendants were causing Ariba to suffer such devastation of its market capitalization, the Insider Selling Defendants fared much better by selling over $1.2 billion of their personally held stock.

| Insider | Shares Sold | Proceeds |
|---|---|---|
| Krach | 4,598,850 | $193,749,060 |
| Kagle | 266,000 | $32,599,700 |
| Hegarty | 2,539,807 | $126,917,243 |
| Cruikshank | 526,814 | $46,241,981 |
| DeSantis | 2,412,900 | $221,759,373 |
| Kinsey | 1,383,253 | $114,450,625 |
| Eliasen | 556,996 | $51,010,477 |
| Tyabji | 243,000 | $12,710,780 |
| Kleissner | 1,040,000 | $72,276,000 |
| Mueller | 150,000 | $19,785,000 |
| Mumford | 333,076 | $16,906,776 |
| Lent | 1,465,000 | $107,502,862 |
| Melchiorre | 536,994 | $33,578,413 |
| Touw | 1,000,000 | $58,741,504 |
| Rome | 1,586,904 | $106,565,896 |
| **TOTAL:** | **18,639,594** | **$1,214,795,689** |

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

68.    Plaintiff brings this action derivatively in the right and for the benefit of Ariba to redress injuries suffered, and to be suffered, by Ariba as a direct result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  Ariba is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court which it would not otherwise have.

1  management of an enterprise has discharged its stewardship responsibility to owners (stockholders)

2  for the use of enterprise resources entrusted to it was violated. To the extent that management offers

3  securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability

4  to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

5            e.     The principle that financial reporting should provide information about an

6  enterprise's financial performance during a period was violated. Investors and creditors often use

7  information about the past to help in assessing the prospects of an enterprise. Thus, although

8  investment and credit decisions reflect investors' expectations about future enterprise performance,

9  those expectations are commonly based at least partly on evaluations of past enterprise performance

10  (FASB Statement of Concepts No. 1, ¶42);

11            f.     The principle that financial reporting should be reliable in that it represents

12  what it purports to represent was violated. That information should be reliable as well as relevant is

13  a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

14            g.     The principle of completeness, which means that nothing is left out of the

15  information that may be necessary to insure that it validly represents underlying events and conditions

16  was violated (FASB Statement of Concepts No. 2, ¶79); and

17            h.     The principle that conservatism be used as a prudent reaction to uncertainty to

18  try to ensure that uncertainties and risks inherent in business situations are adequately considered was

19  violated. The best way to avoid injury to investors is to try to ensure that what is reported represents

20  what it purports to represent (FASB Statement of Concepts No. 2, ¶¶95, 97).

21      66.     Further, the undisclosed adverse information concealed by defendants during the

22  Relevant Period is the type of information which, because of SEC regulations, regulations of the

23  national stock exchanges and customary business practice, is expected by investors and securities

24  analysts to be disclosed and is known by corporate officials and their legal and financial advisors to

25  be the type of information which is expected to be and must be disclosed.

26                                   **INSIDER SALES**

27

28

1    income was material.  Pursuant to GAAP, as set forth in Accounting Principles Board Opinion

2    ("APB") No. 20, the type of restatement announced by Ariba was to correct for material errors in its

3    previously issued financial statements.  *See* APB No. 20, ¶¶7-13.  The restatement of past financial

4    statements is a disfavored method of recognizing an accounting change as it dilutes confidence by

5    investors in the financial statements, it makes it difficult to compare financial statements and it is

6    often difficult, if not impossible, to generate the numbers when restatement occurs.  *See* APB No. 20,

7    ¶14.  Thus, GAAP provides that financial statements should only be restated in limited circumstances,

8    *i.e.*, when there is a change in the reporting entity, there is a change in accounting principles used or

9    to correct an error in previously issued financial statements.  Ariba's restatement was not due to a

10   change in reporting entity or a change in accounting principle, but rather to errors in previously issued

11   financial statements.  Thus, the restatement is an admission by Ariba that its previously issued

12   financial results and its public statements regarding those results were false.

13         65.    Due to these accounting improprieties, the Company presented its financial results and

14   statements in a manner which violated GAAP, including the following fundamental accounting

15   principles:

16         a.    The principle that interim financial reporting should be based upon the same

17   accounting principles and practices used to prepare annual financial statements was violated (APB

18   No. 28, ¶10);

19         b.    The principle that financial reporting should provide information that is useful

20   to present and potential investors and creditors and other users in making rational investment, credit

21   and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

22         c.    The principle that financial reporting should provide information about the

23   economic resources of an enterprise, the claims to those resources, and effects of transactions, events

24   and circumstances that change resources and claims to those resources was violated (FASB Statement

25   of Concepts No. 1, ¶40);

26         d.    The principle that financial reporting should provide information about how

27

28

the adjustment for the chartered air services amounts to $1.2 million. The cumulative adjustments related to the stock options amount to $7.5 million, consisting of increases to Ariba's expenses for fiscal 2000 and 2001 of $8.7 million and $12.0 million, respectively, and a reduction of expenses for fiscal 2002 of $13.2 million.

As a result of these accounting adjustments investors should not rely on the financial information contained in the company's previously filed annual report on Form 10-K for the fiscal years ended September 30, 2000 and September 30, 2001 or in the company's quarterly report on Form 10-Q for the quarters ended March 31, 2000 through June 30, 2002.

The ongoing accounting review is focused on the company's fiscal 2000 financial statements. Ariba is committed to performing a complete and thorough review of these matters and expects the review to be completed by the end of February 2003. Ariba intends to file its annual report on Form 10-K for the fiscal year ended September 30, 2002 after the completion of the review.

Ariba also announced that it expects to receive a Nasdaq staff determination that it is subject to delisting from the Nasdaq Stock Market as a result of failing to timely file its annual report on Form 10-K for the fiscal year ended September 30, 2002. Upon receipt of this determination, Ariba intends to request a hearing before a Nasdaq panel to review the staff determination. There can be no assurance that the Nasdaq panel will grant Ariba's request for continued listing.

63.     On April 10, 2003, the Individual Defendants caused the Company to issue a press release titled "Ariba Completes Accounting Review and Files Forms 10-K and 10-Q with the SEC." The press release stated in relevant part:

Ariba, Inc., the leading Enterprise Spend Management (ESM) solutions provider, today announced that the company's internal review of certain accounting matters is complete and the company's annual report on Form 10-K for the fiscal year ended September 30, 2002 and quarterly report on Form 10-Q for the quarter ended December 31, 2002 have been filed with the Securities and Exchange Commission (SEC). As a result of this review, Ariba has restated its financial statements for the fiscal years ended September 30, 2000 and 2001, and for the quarters ended December 31, 1999 through June 30, 2002. The company has also adjusted the preliminary financial statement information for the quarter and fiscal year ended September 30, 2002 (announced on October 23, 2002) and for the quarter ended December 31, 2002 (announced on January 23, 2003).

* * *

The net effect of all the accounting adjustments is to increase the company's net loss by $9.8 million in fiscal year 2000 and $14.1 million in fiscal year 2001, decrease the net loss by $22.1 million in fiscal year 2002, and increase the net loss by $2.0 million in the first quarter of fiscal year 2003. The cumulative net effect of the adjustments is to increase the company's accumulated deficit at December 31, 2002 by $3.8 million to $4.24 billion.

64.     The fact that Ariba will restate its financial statements for 2000-2002 is an admission that the financial statements originally issued were false and that the overstatement of revenues and

1   are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite

2   footnote or other disclosure.  Regulation S-X requires that interim financial statements must also

3   comply with GAAP, with the exception that interim financial statements need not include disclosure

4   which would be duplicative of disclosures accompanying annual financial statements.  17 C.F.R.

5   §210.10-01(a).

6        60.    In Ariba's 2000-2001 Forms 10-K, it represented that it recognized revenue and

7   expenses in accordance with GAAP.

8        61.    During the Relevant Period, Ariba failed to properly recognize expenses required to

9   be recognized by GAAP.

10        62.    On January 15, 2003, the Individual Defendants caused the Company to issue a press

11   release entitled, "Ariba Provides Update on Accounting Review and Restatement of Financial

12   Statements."  The press release stated in part:

13       Ariba, Inc. announced today that it will restate its financial statements for the fiscal
         years ended September 30, 2001 and 2000 and for the quarters ended March 31, 2000
14       through June 30, 2002 as a result of an ongoing review of accounting matters.  The
         company also announced that because this review is not yet completed, it has not yet
15       filed its annual report on Form 10-K for the fiscal year ended September 30, 2002 with
         the Securities and Exchange Commission.
16
         As previously disclosed, Ariba has determined that, for accounting purposes,
17       it should treat a $10.0 million payment provided personally by Keith Krach, Ariba's
         chairman and co-founder, in March 2001 to Larry Mueller, its president and chief
18       operating officer at the time, as a $10.0 million capital contribution from Mr. Krach
         to Ariba and the payment of compensation from Ariba to Mr. Mueller. Because no
19       company funds were used and there was no commitment to or from Ariba, the
         company originally viewed the payment as a personal transaction.
20
         The company has further determined that chartered air services, provided
21       personally by Mr. Krach to Mr. Mueller, should be treated similarly as a capital
         contribution from Mr. Krach to Ariba and a payment of compensation from the
22       company to Mr. Mueller.  These services were provided over the period from
         September 2000 through July 2001 at a total cost of $1.2 million.
23
         In addition, Ariba has concluded that certain stock options issued to a limited
24       number of individuals by companies that Ariba acquired during fiscal 2000 should be
         accounted for as stock-based compensation expense to Ariba, rather than amortized
25       as goodwill.  As a result, an increase in non-cash stock-based compensation expense
         and a reduction of goodwill amortization expense will be reflected in Ariba's restated
26       financial statements for fiscal 2000, 2001 and 2002.

27       None of the above-described adjustments has any impact on Ariba's cash
         balances or net cash flows for any period.  In addition to the $10.0 million payment,
28

---

The audit committee's review has primarily focused on a $10 million payment, provided personally by Keith Krach, the company's chairman and co-founder, in March 2001 to Larry Mueller, the company's president and chief operating officer at the time of the payment. Because no company funds were used and there was no commitment to or from Ariba, the company originally viewed the payment as a personal transaction. Ariba has now concluded that for accounting purposes, the company should treat the $10 million payment as a capital contribution from Mr. Krach to the company and the payment of compensation from the company to Mr. Mueller.

The $10 million payment at issue does not affect the company's results of operations for fiscal year 2002 nor does no it affect the company's results of operations for any quarter other than the quarter ended March 31, 2001. The company's restated financial statements for the fiscal year ended September 30, 2001 and for the quarter ended March 31, 2001 will reflect a non-cash charge to the company's fiscal 2001 operating expenses that does not affect the company's cash balances, net assets or total stockholders' equity at March 31, 2001 or for any other period.

The audit committee began this review on December 21, 2002, and expects to complete it shortly. Although the review is not completed. Ariba has determined that it will restate its financial statements for the fiscal year ended September 30, 2001 and the quarter ended March 31; 2001. The company's previously filed financial statements for these periods do not reflect the $10 million payment. As a result, the restated financial statements will disclose an additional $10 million in compensation for such periods. Investors accordingly should not rely on the financial information contained in the company's previously filed annual report on Form 10-K for the fiscal year ended September 30, 2001 or in the company's quarterly report on Form 10-Q for the quarter ended March 31, 2001. Restated financial statements for these periods will be included in Ariba's annual report on Form 10-K for the fiscal year ended September 30, 2002 filed with the SEC.

## IMPROPER FINANCIAL REPORTING
## DURING THE RELEVANT PERIOD

57.     The 2000-2002 results were included in Forms 10-Q and 10-K filed with the SEC. The results were also included in press releases disseminated to the public.

58.     The Individual Defendants caused the Company to admit that it inappropriately recorded transactions included in its 2000-2002 results, and has restated those results to increase the Company's expenses such that its 2000-2002 financial statements were not a fair presentation of Ariba's results and were presented in violation of Generally Accepted Accounting Principles ("GAAP") and SEC rules.

59.     GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC which

"In light of the continued soft global economic environment, I am pleased with the solid results for the quarter." said Bob Calderoni, president and CEO of Ariba. "The Ariba® Spend Management suite, especially Ariba® Enterprises Sourcing™, gained traction in our existing installed base as well as with new customers. As I look out to the second half of this calendar year, I expect further reach from our new products. I feel this positions us well for pro forma profitability and believe we could achieve pro forma break-even as early as June."

55.    On April 24, 2002, the Individual Defendants caused the Company to issue a press release entitled, "Ariba Reports Results for Second Quarter Fiscal 2002; Quarterly Revenues Grow to $57.2 Million." The press release stated in part:

Ariba, Inc., the leading Enterprise Spend Management (ESM) solutions provider, today announced results for the second fiscal quarter ended March 31, 2002.

Revenues for the second quarter of fiscal 2002 were $57.2 million. Pro forma net income for the quarter excluding certain non-cash and special charges was $1.1 million, or $0.00 per share, beating the First Call consensus estimate of a loss of $0.01 per share. Ariba's pro forma operating results exclude expenses related to the amortization of goodwill and other intangible assets, business partner warrants, restructuring and lease abandonment costs and stock-based compensation, all of which are included for GAAP reporting purposes. For the second quarter of fiscal 2001, pro forma loss was $48.3 million, or a loss of $0.20 per share. Net loss on a GAAP basis for the second quarter of fiscal 2002 was $154 million, or a loss of $0.60 per share. During the corresponding quarter in fiscal 2001 the net loss on a GAAP basis was $1.8 billion, or a loss of $7.60 per share.

"Despite a challenging market environment, I am pleased with Ariba's performance during the March quarter.  Ariba beat expectations once again, strengthened revenues, improved pro forma earnings per share, and demonstrated stability across the income statement and balance sheet," said Bob Calderoni, president and CEO of Ariba.  "Ariba is building a reputation as a company that executes even in tough market conditions.  We are well positioned for any acceleration in top line revenue to directly result in pro forma profitability and earnings growth.  We have successfully hit pro forma breakeven before schedule and expect pro forma earnings per share to increase when the market for IT spending expands."

56.    On December 31, 2002, the Individual Defendants caused the Company to issue a press release entitled, "Ariba to Restate Fiscal Year 2001 Financial Statements; Delays Filing of Fiscal Year 2002 Annual Report on Form 10-K." The press release stated in part:

Ariba, Inc. announced today that it will restate its financial statements for the fiscal year ended September 30, 2001 for the quarter ended March 31, 2001 as a result of an ongoing review by the company's audit committee.  The review is focused on the accounting treatment relating to certain benefits provided to a limited number of employees of the company during fiscal years 2000 and 2001.  In addition, Ariba has delayed the filing of its annual report on Form 10-K for the fiscal year ended September 30, 2002, which was due on Dec. 30, 2002, until this review is complete. In connection with this delay, Ariba is filing a Notification of Late Filing or Form 12b-25 with the Securities and Exchange Commission (SEC).

Quarterly Results

Revenues for the fourth quarter of fiscal 2001 were at $62.6 million. Net loss for the quarter excluding certain non-cash and special charges was $27.7 million or a loss of $0.11 per share, beating the First Call consensus estimate of a loss of $0.13 per share. During the corresponding quarter in fiscal 2000, the net loss was $1.1 million or a loss of $0.00 per share, excluding certain non-cash and special charges.

Net loss on a GAAP basis for the fourth quarter of fiscal 2001 was $224.3 million, or a loss of $0.89 per share. During the corresponding quarter in fiscal 2000 the net loss on a GAAP basis was $339.3 million, or a loss of $1.50 per share.

Fiscal Year Results

Fiscal year 2001 results were $408.8 million, up 47 percent versus $279.0 million in fiscal 2000. Net loss for the fiscal year 2001 excluding certain non-cash and special charges weas $88.1 million or a loss of $0.36 per share. During fiscal 2000, the net loss was $29.5 million or a loss of $0.15 per share, excluding certain non-cash and special charges.

Net loss on a GAAP basis for fiscal year 2001 was $2,680.7 million, or a loss of $10.96 per share. During the corresponding fiscal year 2000, net loss on a GAAP basis was $792.8 million, or a loss of $4.10 per share.

"We reported a solid quarter despite the soft economic environment and the unexpected and tragic events in September," said Bob Calderoni, president and CEO, Ariba. "Because we quickly responded to the early signs of the changing economic climate and took the necessary steps, our focus now is entirely on customers and our strategy for growth. Our revenues are in line with our original forecast, our cash remains strong at $294 million, and we are well positioned for future profitability.

Our October 17, 2001, Ariba announced the appointment of Bob Calderoni as president and CEO. Founder Keith Krach will remain as chairman of the board.

54.    On January 22, 2002, the Individual Defendants caused the Company to issue a press release entitled, "Ariba Reports Results for First Quarter Fiscal 2002; Quarterly Revenues Total $55.3 Million." The press release stated in part:

Ariba Inc., the leading enterprise spend management solutions provider, today announced results for the first fiscal quarter ended December 31, 2001.

Revenues for the first quarter of fiscal 2002 were $55.3 million. Pro forma net loss for the quarter excluding certain non-cash and special charges was $6.9 million or a loss of $0.03 per share, beating the First Call consensus estimate of a loss of $0.05 per share. Ariba's pro forma operating results exclude expenses related to the amortization of goodwill and other intangible assets, business partner warrants and stock-based compensation, all of which are included for GAAP reporting purposes. During the corresponding quarter in fiscal 2001, pro forma net income was $14.0 million, or $0.05 per share, excluding certain non-cash and special charges. Net loss on a GAAP basis for the first quarter of fiscal 2002 was $161.3 million, or a loss of $0.63 per share. During the corresponding quarter in fiscal 2001 the net loss on a GAAP basis was $347.6 million, or a loss of $1.48 per share.

37 analysts polled by First Call/Thomson Financial. Sales rose to $134.9 million from $17.1 million.

Ariba's losses and revenue are growing as the software maker boosts sales staff and marketing expenses to win business customers and build Web marketplaces where companies can buy and sell supplies. Operating expenses roles to $117.5 million, from $19.9 million a year ago.

52. On April 20, 2001, the Individual Defendants caused the Company to issue a press release entitled, "Ariba Announces Second Quarter 2001 Results; Q2 Fiscal 2001 Revenues Up 126 Percent Year Over Year." The press release stated in part:

Ariba, Inc., the leading business-to-business (B2B) eCommerce platform and network services provider, today announced results for the fiscal second quarter ended March 31, 2001.

Revenues for the second quarter of fiscal 2001 were $90.7 million, up 126 percent from the same period last year. Pro forma net loss for the quarter excluding certain special charges was $48.3 million, or a loss of $0.20 per share. During the corresponding quarter in fiscal 2000, the comparable pro forma net loss was $11.5 million, or a loss of $0.06 per share, excluding certain special charges.

\* \* \*

On April 2 the company revised its guidance for the quarter, reflecting the weakening macroeconomic climate. The Company also announced a plan to reduce spending across all major areas, including a reduction in workforce by approximately 30 percent of the total employee base.

"The slowdown in both the economy and technology spending impacted our business more dramatically than we had expected," said Bob Calderoni, Ariba's CFO. "While the current uncertain market conditions provide low visibility going forward, we took decisive and immediate actions to realign our expense structure to reflect today's economic realities. We believe a strong focus on operational efficiencies and financial discipline will help us weather the current environment and should position us well as the economy recovers."

As a result of the difficult economic conditions and other factors, Ariba has incurred a total of approximately $33.6 million in special charges relating to, among other things, equity investments, and costs related to the cancelled Agile acquisition. The Company also has written down approximately $1.4 billion of goodwill related to an acquisition.

53. On October 24, 2001, the Individual Defendants caused the Company to issue a press release entitled, "Ariba Reports Results for Fourth Quarter and Fiscal 2001; Q4 Fiscal 2001 Revenue Beats Analyst Estimates." The press release stated in part:

Ariba, Inc., the leading spend management solutions provider, today announced results for the fourth quarter and fiscal year ended September 30, 2001.

---

$0.06 per share, beating the First Call consensus estimate of a loss of $0.08 per share. During the corresponding quarter in fiscal 1999, the net loss was $2.8 million or a loss of $0.07 per share, excluding non-operating charges. Including all charges, net loss for the second quarter of fiscal 2000 was $125.9 million or a loss of $0.70 per share, reflecting costs associated primarily for acquisitions. All results are adjusted for a 2-for-1 stock split effective March 31, 2000.

\* \* \*

"The second quarter was a watershed period for Ariba. We increased our customer base by over 100 percent and grew our revenue by 322 percent," said Keith Krach, chairman and chief executive officer of Ariba. "At the same time, we beat analyst EPS expectations and showed another consecutive quarter of cash flow positive from operations, demonstrating the Company's ability to grow rapidly while continuing to show high quality financial performance."

50.    On July 12, 2000, the Individual Defendants caused the Company to issue a press release entitled, "Ariba Announces Record Third Quarter Revenues of $80.7 Million, Up 578%; Net Loss Per Share $0.05, Beats First Call Estimates." The press release stated in part:

Ariba, Inc., the leading business-to-business (B2B) eCommerce platform and network services provider, today announced record results for the third fiscal quarter ended June 30, 2000.

Revenues for the third quarter of fiscal 2000 marked the largest quarter in Ariba's history at $80.7 million, up 101 percent from the previous quarter and up 578 percent from the same period last year. Net loss for the quarter excluding non-operating charges was $11.3 million or a loss of $0.05 per share, beating the First Call consensus estimate of a loss of $0.08 per share. During the corresponding quarter in fiscal 1999, the net loss was $6.0 million or a loss of $0.11 per share, excluding non-operating charges.

"Our focus on delivering quality technology, deployment excellence, great partnerships and customer driven results is once again manifested in our high quality financial performance this quarter. We doubled our revenues from last quarter, signed more than 100 new deals, and deployed more than twice as many customers as last year," said Keith Krach, Ariba's chairman and chief executive officer. "Going forward, Ariba will continue to provide the leadership, innovation and underlying B2B infrastructure creating unprecedented value for buyers, suppliers and markeplaces."

51.    On October 18, 2000, *Bloomberg* carried an article entitled, "Ariba 4th-Qtr Loss Widens on Higher Expenses as Sales Surge." The article stated in part:

Ariba, Inc., which makes software to help companies buy and sell goods over the Internet, said its fourth-quarter loss widened as expenses surged and sales rose more than eightfold.

The loss widened to $339.3 million, or $1.50 a share, from $9.88 million, or 7 cents, a year ago. Excluding amortization, Ariba lost $1.06 million, or break-even a share. On that basis, it was expected to lose 5 cents a share, the average estimate of

<u>VERIFICATION</u>

I, Laurie A. Traktman, hereby declare as follows:

1.      I am a member of the law firm of Gilbert & Sackman, A Law Corporation, counsel for Plaintiff in the above-entitled action.  I have read the foregoing complaint and know the contents thereof.  I am informed and believe the matters therein are true and on that ground allege that the matters stated therein are true.

2.      I make this Verification because Plaintiff is absent from the County of Los Angeles where I maintain my office.

Executed this 25th day of June, 2003, at Los Angeles, California.

_____
Laurie A. Traktman

1

**JURY DEMAND**

2          Plaintiff demands a trial by jury.

3    DATED: June __25__, 2003          **GILBERT & SACKMAN, A LAW**
                                       **CORPORATION**
4                                      JAY SMITH
                                       LAURIE A. TRAKTMAN
5

6                                      _____
                                       LAURIE A. TRATKMAN
7

8                                      6100 Wilshire Blvd., Suite 700
                                       Los Angeles, CA 90048
9                                      Telephone: 323/938-3000; ext. 350
                                       Facsimile:  323/937-9139

10                                     Plaintiffs' Liaison Counsel

11
                                       **WHATLEY DRAKE, LLC**
12                                     JOE R. WHATLEY, JR.
                                       PETER H. BURKE
13                                     2323 Second Avenue North
                                       Birmingham, AL  35202
14                                     Telephone:  205/328-9576
                                       Facsimile:  205/328-9669
15
                                       Plaintiffs' Lead Co-Counsel
16

17                                     **REICH & BINSTOCK, LLP**
                                       PAUL T. WARNER
18                                     4265 San Felipe, Suite 1000
                                       Houston, TX 77027
19                                     Telephone: 713/622-7271
                                       Facsimile: 713/623-8724
20
                                       Plaintiffs' Lead Co-Counsel
21

22

23

24

25

26

27

28

_____
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
35

1          WHEREFORE, plaintiff demands judgment as follows:

2          A.      Against all of the Individual Defendants and in favor of the Company for the amount

3   of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary

4   duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

5          B.      Determining and awarding Ariba treble damages pursuant to California Corporations

6   Code §25502.5(a) for the Insider Selling Defendants' violations of California Corporations Code

7   §25402;

8          C.      Extraordinary equitable and/or injunctive relief as permitted by law, equity and state

9   statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust

10  on or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to

11  assure that plaintiff on behalf of Ariba has an effective remedy;

12         D.      Awarding to Ariba restitution from the defendants, and each of them, and ordering

13  disgorgement of all profits, benefits and other compensation obtained by the defendants;

14         E.      Awarding to plaintiff the costs and disbursements of the action, including reasonable

15  attorneys' fees, accountants' and experts' fees, costs, and expenses; and

16         F.      Granting such other and further relief as the Court deems just and proper.

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28

---

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

34

100.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

101.   Plaintiff on behalf of Ariba has no adequate remedy at law.

## COUNT VII

### Against All Defendants for Waste of Corporate Assets

102.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

103.   As a result of the improper accounting, and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, defendants have caused Ariba to waste valuable corporate assets by paying incentive based bonuses to certain of its executive officers.

104.   As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

105.   Plaintiff on behalf of Ariba has no adequate remedy at law.

## COUNT VIII

### Against All Defendants for Unjust Enrichment

106.   Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

107.   By their wrongful acts and omissions, defendants were unjustly enriched at the expense of and to the detriment of Ariba.

108.   Plaintiffs seek restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

109.   Plaintiffs, as shareholders and representatives of Ariba, seek restitution and disgorgement of profits for the Company as hereinafter set forth.

### PRAYER FOR RELIEF

90.     As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Ariba has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

91.     Plaintiff on behalf of Ariba has no adequate remedy at law.

## COUNT V

### Against All Defendants for Abuse of Control

92.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

93.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Ariba, for which they are legally responsible.

94.     As a direct and proximate result of the Individual Defendants' abuse of control, Ariba has sustained significant damages.

95.     As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

96.     Plaintiff on behalf of Ariba has no adequate remedy at law.

## COUNT VI

### Against All Defendants for Gross Mismanagement

97.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

///

98.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Ariba in a manner consistent with the operations of a publicly held corporation.

99.     As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Ariba has sustained significant damages in excess of hundreds of millions of dollars.

83.     The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects. It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Ariba common stock.

84.     At the time of their stock sales, the Insider Selling Defendants knew of the Company's improper accounting and financial results. The Insider Selling Defendants' sales of Ariba common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

85.     Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

## COUNT IV

### Against All Defendants for Breach of Fiduciary Duty

86.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

87.     The Individual Defendants owed and owe Ariba fiduciary obligations. By reason of their fiduciary relationships, the Officer Defendants and Director Defendants owed and owe Ariba the highest obligation of good faith, fair dealing, loyalty and due care.

88.     The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

89.     Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial results of the Company and failed to correct the Company's publicly reported financial results and guidance. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

## COUNT II

### Against the Insider Selling Defendants for Violation of
### California Corporations Code §25402

76.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

77.     At the time that the Insider Selling Defendants sold their Ariba common stock as set forth herein, by reason of their high executive and/or directorship positions with Ariba, the Insider Selling Defendants had access to highly material information regarding the Company, including the information set forth herein regarding the true adverse facts of Ariba's improper accounting.

78.     At the time of such sales, that information was not generally available to the public or the securities markets.  Had such information been generally available, it would have significantly reduced the market price of Ariba shares at that time.

79.     The Insider Selling Defendants, and each of them, had actual knowledge of material, adverse non-public information and thus sold their Ariba common stock in California in violation of California Corporations Code §25402.

80.     Pursuant to California Corporations Code §25502.5, the Insider Selling Defendants, and each of them, are liable to Ariba for damages in an amount up to three times the difference between the price at which Ariba common stock was sold by the defendants, and each of them, and the market value that Ariba common stock would have had at the time of the sale if the information known to the defendants, and each of them, had been publicly disseminated prior to that time and a reasonable time had elapsed for the market to absorb the information.

## COUNT III

### Against the Insider Selling Defendants for Breach of Fiduciary
### Duties for Insider Selling and Misappropriation of Information

81.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

82.     At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold Ariba common stock on the basis of such information.